**J. DOUGLAS PINNEY, M.D.,**                          *       IN THE
formerly of:      2020 Skyline Road
                  Towson, Maryland 21204             *       CIRCUIT COURT

                  and                                *       FOR

**GINO ANTHONY CAMMARATA**                           *       BALTIMORE CITY
6L Brook Farm Court
Perry Hall, Maryland 21128                           *
                                                             Civil Action No: *24-C-01-001897*
                  and                                *

**MICHAEL J. HALEY**                                 *
4615 N. Park Avenue, #311
Chevy Chase, Maryland 20815                          *

        *Plaintiffs individually and on behalf of*   *
        *all others similarly situated,*
                                                     *
        v.
                                                     *
**NOKIA, Inc.**
A/K/A Nokia Mobile Phones, Inc.                      *
6000 Connection Drive
Irving, Texas 75039.                                 *
        SERVE ON:  Resident Agent
                  National Registered Agents, Inc.*
                  11 East Chase Street
                  Baltimore, MD 21202               *

                  and                                *

**WESTINGHOUSE COMMUNICATIONS**                      *
32 South Street
Baltimore, Maryland 21202.                           *

                  and                                *

**NEC AMERICA, INC. ("NEC")**                        *
8 Old Sod Farm Road
Melville, New York 11747                             *
        SERVE ON:  Resident Agent
                  CSC-Lawyers Incorporating Service *

1

11 East Chase Street                         *
Baltimore, MD 21202

                                             *
and
                                             *

**LG ELECTRONICS MOBILECOMM**
**U.S.A., INC.**                             *
10101 Old Grove Road
San Diego, CA 92131                          *
        SERVE ON: Josiah S. Trager
                Hughes Hubbard & Reed, LLP *
                One Battery Park Plaza
                New York, NY 10004-1482     *

        and                                  *

**ERICSSON WIRELESS COMMUNICATIONS,** *
**INC.**
A/K/A Ericsson, Inc.                         *
740 East Campbell Road
Richardson, Texas 75081                      *
        SERVE ON:  Resident Agent
                National Registered Agents, Inc. *
                11 East Chase Street
                Baltimore, MD 21202         *

        and                                  *

**MOTOROLA, INC.**                           *
5725 E. River Road
Chicago, Illinois 60631                      *
        SERVE ON:  Resident Agent
                The Corporation Trust       *
                300 East Lombard Street
                Baltimore, MD 21202         *

        and                                  *

**SPRINT PCS LIMITED PARTNERSHIP**           *
A/K/A Sprint Spectrum
A/K/A Sprint                                 *
formerly known as,
Bell Atlantic-Maryland, Inc.                 *

2

4900 Main Street, 12th Floor      *
Kansas City, Missouri 64112
       SERVE ON:  Resident Agent     *
            Prentice-Hall Corporation System
            11 East Chase Street      *
            Baltimore, Maryland 21202

                             *

        and                     *

                             *

**AUDIOVOX COMMUNICATIONS**
**CORPORATION**                   *
A/K/A  Audiovox Corporation
150 Marcus Blvd.               *
Hauppauge, New York 11788
       SERVE ON:  Resident Agent     *
            United Corporate Services, Inc.
            20 South Charles Street, Ste. 1200*
            Baltimore, Maryland 21201

                             *

        and                     *

                             *

**NEXTEL COMMUNICATIONS OF**
     **THE MID-ATLANTIC, INC.**     *
D/B/A Nextel Communications
4340 East West Highway, Suite 800    *
Bethesda, Maryland 20814
       SERVE ON:  Resident Agent     *
            Corporation Service Co.
            2711 Centerville Road     *
            Suite 400
            Wilmington, DE 19808      *

                             *

        and                     *

**NEXTEL BOOST OF THE MID-ATLANTIC,**   *
**LLC**
4340 East West Highway, Suite 800    *
Bethesda, Maryland 20814
       SERVE ON:  Andrew Jarzyna     *
            Skadden Arps Slate
             Meagher & Flom, LLP     *
            333 W. Wacker Drive
            Suite 2100             *
            Chicago, IL 60606

and                                                    *

**MATSUSHITA CORPORATION OF**                          *
**AMERICA**
A/K/A Panasonic Corporation                            *
9401 West Grand Avenue
Frankin Park, Illinois 60131                           *
      SERVE ON:  Resident Agent
           The Corporation Trust       *
           300 East Lombard Street
           Baltimore, Maryland 21202   *

      and                                    *

**PHILIPS ELECTRONIC NORTH AMERICA**                   *
**CORPORATION**
100 East 42nd Street                              *
New York, New York 10017.
      SERVE ON:  Resident Agent             *
           The Corporation Trust
           300 East Lombard Street      *
           Baltimore, Maryland 21202
                                        *

      and                                    *

**QUALCOMM INCORPORATED**                              *
A/K/A Qualcomm, Inc.                                   *
6455 Lusk Boulevard
San Diego, California, 92121                           *
      SERVE ON:  Resident Agent
           CSC-Lawyers Incorporating   *
           Service Company
           11 East Chase Street         *
           Baltimore, Maryland 21202
                                        *

      and                                    *

**SAMSUNG ELECTRONICS AMERICA, INC.**                  *
A/K/A Samsung Electronics
105 Challenger Road
Ridgefield Park, NJ 07660                              *
      SERVE ON:  Hank Byun
           105 Challenger Road          *
           Ridgefield Park, New Jersey 07660

4

and                                              *

**SANYO NORTH AMERICA, INC.**                    *
A/K/A Sanyo North America Group
218 State Route 17 North                         *
Rochelle Park, New Jersey 07662
          SERVE ON:  John Snyder, President      *
                     218 State Route 17 North
                     Rochelle Park, New Jersey 07662  *

          and                                    *

**SONY ELECTRONICS, INC.**                       *
The Corporation Trust Incorporated
300 East Lombard Street                          *
Baltimore, Maryland 21202
          SERVE ON:  Resident Agent              *
                     The Corporation Trust
                     300 East Lombard Street     *
                     Baltimore, Maryland 21202
                                                 *

          and                                    *

**AT&T CORP.**                                   *
A/K/A AT&T
195 Broadway                                     *
New York, New York                               *
          SERVE ON:  Resident Agent
                     Corporation Trust Incorporated *
                     300 East Lombard Street
                     Baltimore, Maryland 21202   *

          and                                    *

**CELLCO PARTNERSHIP D/B/A**                     *
**VERIZON WIRELESS**
formerly d/b/a Bell Atlantic Mobile,             *
formerly d/b/a Bell Atlantic NYNEX Mobile
180 Washington Valley Road                       *
Bedminster, New Jersey, 07921
          SERVE ON:  Dennis F. Strigl, President *
                     180 Washington Valley Road
                     Bedminster, New Jersey 07921 *

5

and                                     *

**CINGULAR WIRELESS LLC**                *
formerly known as Southwestern Bell
Mobile Systems, Inc.                     *
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808               *
     SERVE ON:  Resident Agent
             CSC-Lawyers Service    *
             Incorporating Service Company
             11 East Chase Street   *
             Baltimore, MD 21202
                    *

and                                     *

**CINGULAR WIRELESS**                    *
A/K/A Washington/Baltimore Cellular Limited PA  *
7855 Walker Drive, Suite 100
Greenbelt, Maryland 20770                *
     SERVE ON:  Resident Agent
             The Corporation Trust   *
             300 East Lombard Street
             Baltimore, Maryland 21202  *

and                                     *

**SBC COMMUNICATIONS INC.**              *
175 East Houston Street
San Antonio, Texas 78205                 *
     SERVE ON:  Resident Agent
             C.T. Corporation Systems  *
             350 North Saint Paul Street
             Dallas, Texas 75201       *

and                                     *

**CELLULAR ONE GROUP**                   *
A/K/A Cellular One
5001 Lyndon B Johnson Freeway, Ste 700   *
Dallas, Texas 75244
     SERVE ON:  Richard J. Lyons, President  *
             5001 Lyndon B. Johnson Freeway
             Suite 700                 *
             Dallas, Texas 75244

and                                         *

**VOICESTREAM WIRELESS CORPORATION** *
A/K/A VoiceStream Wireless
3650 131st Avenue SE                        *
Suite 200
Bellvue, Washington 98006                   *
    SERVE ON:  Resident Agent
            CSC-Lawyers Service         *
            Incorporating Service Company
            11 East Chase Street         *
            Baltimore, MD 21202
                                        *

and                                         *

*

**C.E.I., INC.**
A/K/A Communications Electronics, Inc.      *
A/K/A Communications Electronics
9494 Deerco Road                            *
Timonium, Maryland 21093
    SERVE ON:  Resident Agent              *
            Bryan Cowling
            1133 Bentalou Street         *
            Baltimore, MD 21216
                                        *

and                                         *

*

**BALTIMORE BUSINESS
COMMUNICATIONS, INC.**                      *
2111 Greenspring Avenue
Timonium, Maryland 21093                    *
    SERVE ON:  Resident Agent
            John A. Armstrong, Jr.       *
            12 Galloway Avenue, Ste. 3A
            Hunt Valley, MD 21030        *

*Defendants*                                *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## SECOND AMENDED COMPLAINT

NOW COME J. Douglas Pinney, Michael J. Haley, and Gino Cammarata through the Law Offices of Peter G. Angelos P.C., and their undersigned counsel of record, on behalf of themselves and all other persons similarly situated, pursuant to Maryland Rule 2-231, who hereby aver as follows:

## I. NATURE OF THE CASE

1.      Through a course of conduct, the Defendants have manufactured, supplied, promoted, sold, leased and/or provided service for wireless handheld telephones ("WHHP") when they knew or should have known that their products generate and emit radio frequency radiation ("RFR") that causes an adverse cellular reaction and/or cellular dysfunction and/or cellular injury ("biological injury") through its adverse health effect for example on such bodily systems and/or functions as: calcium and ion distribution across the cell membrane, melatonin production, neurological function, DNA (single and double strand breaks and chromosome damage), enzyme activities, cell stress and gene transcription, and the permeability of the blood brain barrier (collectively hereinafter sometimes described as "the health risk" and/or "the biological effects").  For the purposes of this action WHHPs refers to those that are designed and manufactured so as to readily allow for the use of a headset in conjunction with the WHHP, unless otherwise specified.

2.      Through a course of conduct the Defendants, acting individually and collectively, failed to adequately disclose to the consuming public the fact that WHHPs emit RFR that causes biological injury, creating a risk to the user's health.

3.      WHHPs are sold in the United States and throughout the world.  More than 190 million Americans use WHHPs and over 1 billion have been sold throughout the world.

4.      This action is brought for monetary damages, declaratory and/or equitable relief.

5.      The purpose of this action is to hold accountable and to obtain maximum legal and equitable relief from those corporations and entities that are responsible for producing and placing into the stream of commerce WHHPs, which create a health risk to users by causing biological injury.

6.      WHHPs are wireless communication devices which transmit a wireless signal from the antenna of the WHHP to the antenna at a cell tower or from the antenna at a cell tower to the antenna on the WHHP depending upon whether the WHHP user is making a telephone call or receiving a telephone call.

7.      WHHPs are powered by a battery which creates the RFR waves.

8.      The waves referred to in paragraph 7 travel from the antenna on the WHHP to a cell tower or from the cell tower to the antenna on the WHHP.

9.      RFR is emitted from the WHHP antenna and penetrates the user's human tissue.

10.     Research and peer reviewed literature has demonstrated that RFR from WHHPs causes certain types of biological injury and/or biological effects which, in turn, creates risk to the users' health.

## II. JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Annotated Code of Maryland (1998 Replacement Volume), Courts and Judicial Proceedings §§ 6-102 and 6-103.  Plaintiffs purchased their WHHPs in Maryland and were thereby damaged as set forth herein. The Defendants are all doing business in Maryland, received substantial compensation and profits from the promotion of, sale of, lease of and/or provision of service for WHHPs in Maryland and have made material omissions and misrepresentations in Maryland.  At all times relevant herein, acts and

9

conduct in furtherance of the conspiracy, which is the hub of the wrongful conduct alleged herein, occurred in Maryland.

Venue in this case is founded on Annotated Code of Maryland (1998 Replacement Volume), Courts and Judicial Proceedings §§ 6-201(b); 6-202(3); 6-202(8); and 6-202(11).

## III. PARTIES

### A. PLAINTIFFS AND PROPOSED CLASS REPRESENTATIVE.

12.     Plaintiff J. Douglas Pinney, M.D. is an adult individual who formally resided at 2020 Skyline Road, Towson, Maryland 21204. In 2000, Plaintiff while a Maryland resident purchased from Defendant AT&T a WHHP which was sold without a headset. The WHHP was manufactured by Defendant Motorola. Incident to and as a result of this purchase, Plaintiff was provided service by Defendant Cellco d/b/a Verizon Wireless. Plaintiff has since purchased a headset.

13.     Plaintiff Michael J. Haley is an adult individual who resides at 4615 N. Park Avenue, #311, Chevy Chase, Maryland 20815. On January 16, 2006, Plaintiff purchased from Defendant Cellco d/b/a Verizon Wireless (located at 6932 Wisconsin Avenue, Chevy Chase, Maryland 20815) a Motorola Razr V3C WHHP which was sold without a headset. The WHHP was manufactured by Defendant Motorola. Incident to and as a result of this purchase, Plaintiff was provided service also by Defendant Verizon Wireless. On or about October, 2003, Plaintiff purchased from Defendant Cellco d/b/a Verizon Wireless (located at 7101 Democracy Boulevard, Space 2340, Bethesda, Maryland 20817) a LG VX6000 WHHP which was sold without a headset. The WHHP was manufactured by Defendant LG Electronics Mobilecomm U.S.A., Inc. Incident to and as a result of this purchase, Plaintiff was provided service also by Defendant Verizon Wireless. Subsequently, Plaintiff purchased from Defendant Cellco d/b/a Verizon Wireless a Motorola V60 WHHP which

was sold without a headset. The WHHP was manufactured by Defendant Motorola. Incident to and as a result of this purchase, Plaintiff was provided service also by Defendant Verizon Wireless. Prior to that purchase Plaintiff purchased from Defendant Cellco d/b/a Verizon Wireless a Motorola Star Tac WHHP which was sold without a headset. The WHHP was manufactured by Defendant Motorola. Incident to and as a result of this purchase, Plaintiff was provided service also by Defendant Verizon Wireless.

14.    Plaintiff Gino Anthony Cammarata is an adult individual who resides at 6L Brook Farm Court, Perry Hall, Maryland 21128. On May 31, 2005, Plaintiff purchased from Defendant Cellco Partnership D/B/A Verizon Wireless located at 8149 Honeygo Blvd., Suite E, Nottingham, MD 21236-8202 a WHHP which was sold without a headset. The WHHP was manufactured by Defendant LG Electronics MobileComm U.S.A, Inc. Incident to and as a result of this purchase, Plaintiff was provided service also by Defendant Cellco d/b/a Verizon Wireless. Plaintiff purchased a headset subsequent to his WHHP purchase.

**B. DEFENDANTS**

15.    At all times relevant to this Complaint, the Defendant, LG Electronics MobileComm U.S.A, Inc. ("LG") is a corporation having its principal place of business at 10101 Old Grove Road, San Diego, CA 92131. At all times relevant herein, LG, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

16.    At all times relevant to this Complaint, the Defendant NOKIA, Inc. a/k/a Nokia Mobile Phones, Inc. ("Nokia") is a Delaware corporation, and was authorized to do business under

11

the laws of the State of Maryland, with its principal place of business at 6000 Connection Drive, Irving, Texas 75039. At all times relevant herein, NOKIA, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacted business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

17.    At all times relevant to this Complaint, the Defendant WESTINGHOUSE COMMUNICATIONS ("Westinghouse") which is owned by RSL COM U.S.A., Inc. is an unincorporated entity legally active and present in Maryland with its address at Westinghouse Communications Corporation Trust Incorporated, 32 South Street, Baltimore, Maryland 21202. At all times relevant herein, WESTINGHOUSE, through its agents, distributors, servants and/or employees engaged in the provision of voice services for WHHPs.

18.    At all times relevant to this Complaint, the Defendant NEC AMERICA, INC. ("NEC") is a corporation organized and existing under the laws of the State of New York, and was authorized to do business under the laws of the State of Maryland, with its principal place of business at 8 Old Sod Farm Road, Melville, New York 11747. At all times relevant herein, NEC, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacted business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

19.    At all times relevant to this Complaint, the Defendant Ericsson Wireless Communications, Inc. A/K/A Ericsson, Inc. ("ERICSSON") is a corporation organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, with its principal place of business at 740 East Campbell Road, Richardson,

12

Texas 75081. At all times relevant herein, Ericsson, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacted business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

20.     At all times relevant to this Complaint, the Defendant, Motorola, Inc. (hereinafter referred to as "MOTOROLA") is a corporation organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 5725 E. River Road, Chicago, Illinois 60631. At all times relevant herein, Motorola, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

21.     At all times relevant to this Complaint, the Defendant, Sprint PCS Limited Partnership, A/K/A Sprint Spectrum, A/K/A Sprint, formerly known as, Bell Atlantic-Maryland, Inc. (hereinafter referred to as "SPRINT") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 4900 Main Street, 12th Floor, Kansas City, Missouri 64112. At all times relevant herein, Sprint, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

22.     At all times relevant to this Complaint, the Defendant, Audiovox Communications Corporation A/K/A Audiovox Corporation. (hereinafter referred to as "AUDIOVOX") is a corporation organized and existing under the laws of the State of Delaware, and was authorized to

do business under the laws of the State of Maryland, having its principal place of business in the State of New York at 150 Marcus Blvd, Hauppauge, New York 11788. At all times relevant herein, Audiovox, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

23.     At all times relevant to this Complaint, the Defendant, Nextel Communications of the Mid-Atlantic, Inc., d/b/a Nextel Communications, Inc. (hereinafter referred to as "NEXTEL") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 4340 East West Highway, Suite 800, Bethesda, Maryland 20814. At all times relevant herein, Nextel, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

24.     At all times relevant to this Complaint, the Defendant, Nextel Boost of Mid-Atlantic, LLC (hereinafter referred to as "BOOST") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 4340 East West Highway, Suite 800, Bethesda, Maryland 20814. At all times relevant herein, Boost, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

25.     At all times relevant to this Complaint, the Defendant, Matsushita Corporation of America A/K/A Panasonic Corporation (hereinafter referred to as "PANASONIC") is a corporation

organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 9401 West Grand Avenue, Frankin Park, Illinois 60131. At all times relevant herein, Panasonic, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

26.    At all times relevant to this Complaint, the Defendant, Philips Electronic North America Corporation (hereinafter referred to as "PHILIPS") is a corporation organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 100 East 42nd Street, New York, New York 10017. At all times relevant herein, Philips, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

27.    At all times relevant to this Complaint, the Defendant, Qualcomm Incorporated A/K/A Qualcomm, Inc. (hereinafter referred to as "QUALCOMM") is a corporation organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 6455 Lusk Boulevard, San Diego, California, 92121. At all times relevant herein, Qualcomm, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs and WHHP services . At all times relevant herein, Qualcomm was transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

28.     At all times relevant to this Complaint, the Defendant, Samsung Telecommunications America, L.P. A/K/A Samsung Electronics (hereinafter referred to as "SAMSUNG") is a corporation having its principal place of business at 105 Challenger Road, Ridgefield Park, NJ 07660.  At all times relevant herein, Samsung, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

29.     At all times relevant to this Complaint, the Defendant, Sanyo North America, Inc. A/K/A Sanyo North America Group (hereinafter referred to as "SANYO") is a corporation having its principal place of business at 218 State Route 17 North, Rochelle Park, New Jersey 07662.  At all times relevant herein, Sanyo, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

30.     At all times relevant to this Complaint, the Defendant, Sony Electronics, Inc.(hereinafter referred to as "SONY") is a corporation organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at The Corporation Trust Incorporated, 300 East Lombard Street, Baltimore, Maryland 21202.  At all times relevant herein, Sony, through its agents, distributors, servants and/or employees engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

31.     At all times relevant to this Complaint, the Defendant, AT&T Wireless Services, Inc., A/K/A AT&T, (hereinafter referred to as "AT&T") is a corporation organized and existing under

16

the laws of the State of New York, having its principal place of business at 195 Broadway, New York, New York. At all times relevant herein, AT&T, through its agents, distributors, servants and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

32. At all times relevant to this Complaint, the Defendant, Cellco Partnership, d/b/a Verizon Wireless, formerly d/b/a Bell Atlantic Mobile, formerly d/b/a Bell Atlantic NYNEX Mobile (hereinafter referred to as "CELLCO"), is a partnership organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 180 Washington Valley Road, Bedminster, New Jersey, 07921. At all times relevant herein, Cellco, through its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State (with more than 30 stores and/or authorized agents in Maryland), as well as, to cellular telephone owners and users throughout its service areas.

33. At all times relevant to this Complaint, the Defendant, Cingular Wireless LLC formerly known as Southwestern Bell Mobile Systems, Inc. A/K/A Southwestern Bell Wireless (hereinafter referred to as "CINGULAR WIRELESS"), is a corporation organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. At all times relevant herein, Cingular Wireless, through its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone

equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

34.     At all times relevant to this Complaint, the Defendant, Cingular Wireless A/K/A Washington/Baltimore Cellular Limited PA, (hereinafter referred to as "CINGULAR"), is a limited partnership organized and existing under the laws of the State of Virginia, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 7855 Walker Drive, Suite 100, Greenbelt, Maryland 20770. At all times relevant herein, Cingular, through its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

35.     At all times relevant to this Complaint, the Defendant, SBC Communications Inc. (hereinafter referred to as "SBC"), is a corporation and existing under the laws of the State of Delaware, having its principal place of business at 175 East Houston Street, San Antonio, Texas 78205, and SBC was conducting its business at all times relevant herein through its affiliate corporations, companies, and partnerships, and its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State.

36.     At all times relevant to this Complaint, the Defendant, Cellular One Group, A/K/A Cellular One (hereinafter referred to as "CELLULAR ONE GROUP"), is a partnership organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 5001 Lyndon B Johnson Freeway, Ste 700, Dallas, Texas 75244. At all times relevant herein, Cellular One Group, through

18

its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

37.    At all times relevant to this Complaint, the Defendant, VoiceStream Wireless Corporation, A/K/A VoiceStream Wireless (hereinafter referred to as "VOICESTREAM"), is a partnership organized and existing under the laws of the State of Delaware, and was authorized to do business under the laws of the State of Maryland, having its principal place of business at 3650 131st Avenue SE, Suite 200, Bellvue, Washington, 98006. At all times relevant herein, VoiceStream, through its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

38.    At all times relevant to this Complaint, the Defendant, C.E.I., Inc., A/K/A Communications Electronics, Inc. A/K/A Communications Electronics (hereinafter referred to as "CEI"), is a corporation organized and existing under the laws of the State of Maryland, and has its principal place of business at 9494 Deerco Road, Timonium, Maryland 21093. At all times relevant herein, CEI, through its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services throughout the State of Maryland.

39.    At all times relevant to this Complaint, the Defendant, Baltimore Business Communications, Inc. (hereinafter referred to as "Baltimore Communications"), is a corporation organized and existing under the laws of the State of Maryland, and has its principal place of

19

business at 2111 Greenspring Ave., Timonium, Maryland 21093.  At all times relevant herein, Baltimore Communications, through its agents, servants, distributors, and/or employees engaged in the sale and/or promotion of WHHPs, cellular telephone equipment and transmission services throughout the State of Maryland.

40.    At all times relevant to this Complaint, the Defendant, Cellular Telecommunication Industry Association N/K/A Cellular Telecommunication Internet Association (hereinafter referred to as "CTIA"), is the trade association existing under the laws of the District of Columbia, having its principal place of business at 1250 Connecticut Avenue, N.W., Washington, D.C. 20036, and CTIA was conducting its business at all times relevant herein through its agents, servants, and/or employees and represented the safety in the use of WHHPs to the to cellular telephone owners and users in Maryland.

41.    At all times relevant to this Complaint, the Defendant, Telecommunication Industry Association (hereinafter referred to as "TIA"), is the trade association existing under the laws of the District of Columbia, having its principal place of business in Washington, D.C., and TIA was conducting its business at all times relevant herein through its agents, servants, and/or employees and represented the safety in the use of WHHPs to cellular telephone owners and users in Maryland.

42.    Defendants John Does 1 through 50 are as yet unnamed defendants who at all times relevant hereto through their agents, distributors, servants and/or employees were engaged in the design, manufacture, marketing and sale of WHHPs, and transacting business in Baltimore City, Maryland and elsewhere in this State, as well as nationally and internationally.

43.    Defendants John Does 51 through 100 are as yet unnamed defendants who at all times relevant hereto through their agents, servants, distributors, and/or employees were engaged in the

sale and/or promotion of WHHPs, cellular telephone equipment and transmission services in Baltimore City, Maryland and elsewhere in this State, as well as, to cellular telephone owners and users throughout its service areas.

## IV.  CLASS ACTION ALLEGATIONS

44.    The named Plaintiffs bring this class action on behalf of themselves and all other persons similarly situated for the purpose of asserting the claims alleged on a common basis.

The proposed classes are defined as:

a.    All purchasers or lessees of WHHPs who are residents of the State of Maryland, and who were residents of the State of Maryland when they purchased or leased a WHHP, in the State of Maryland, for their own use or for the primary use of their minor child, neither of whom have been diagnosed with a related injury and were not furnished a headset at the time they purchased or leased their WHHP;

b.    All purchasers or lessees of WHHPs who were residents of the State of Maryland when they purchased or leased a WHHP, in the State of Maryland, for their own use or for the primary use of their minor child, neither of whom have been diagnosed with a related injury and were not furnished a headset at the time they purchased or leased their WHHP who now reside [elsewhere] for reasons unrelated to the causes of action in this case; and

          c.        All future purchasers of WHHPs in the State of Maryland, who are residents of the State of Maryland, and who have not been diagnosed with a WHHP related injury.

45.    The classes defined above in paragraphs 42a, 42b, and 42c may also be referred to collectively as the "Class".

46.    **Numerosity of the classes.  Maryland Rule 2-231(a)(1).**  The Plaintiffs are unable to state with precision the exact size of the classes noted above but believe that it is so numerous that individual joinder of all of its members for each class is impracticable.

47.    **Existence and predominance of common questions of law and fact.  Maryland Rule 2-231(a)(2) and 2-231(b)(3)-(4).**  Common questions of law and fact exist as to all members of the classes.  The common questions predominate over any questions affecting only individual members of the classes.  These common legal and factual questions include, but are not limited to, the following:

        a.        whether, during any period, the Defendants acting individually or collectively, informed the Plaintiffs and others similarly situated of the association between RFR and biological injury and/or biological effects and the risks to human health arising therefrom.

        b.        whether, during any period, the Defendants acting individually or collectively, failed to provide headsets which would have eliminated, reduced or minimized the RFR exposure to the head and/or brain and as a result any

biological effects from RFR and its risk to human health arising therefrom.

c.      whether defendants falsely or deceptively misrepresented or failed to adequately disclose in their advertisements, promotional materials and other materials, among other things, the biological injury and/or biological effects and potential health risks associated with the use of WHHPs;

d.      whether defendants made express or implied, direct or indirect, misrepresentations of fact or omitted and concealed material facts about the WHHPs; and

e.      whether defendants' conduct constituted a breach of express and/or implied warranties, and thus violated the Maryland Consumer Protection Act, Md. Com. Law § 13-301 et seq., or violated other provisions of Maryland statutory and/or common law.

f.      whether, during any period, the Defendants, acting individually or collectively, failed to conduct appropriate, reasonable and adequate testing of WHHPs to determine the association between RFR and biological injury and/or biological effects and the risk to human health arising therefrom;

g.      whether, during any period, the Defendants acting

23

individually or collectively, failed to conduct appropriate, reasonable and adequate research to determine the association between RFR and harmful biological injury and/or biological effects.

48.    **Defendants have acted and/or refused to act on grounds generally applicable to the class - final declaratory relief is appropriate.  Maryland Rule 2-231(b)(2).**  Additionally, the classes defined in paragraph 44 are certifiable under the provisions of Maryland Rule 2-231(b)(2) as Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory relief with respect to the class defined in paragraph 44.

49.  **Typicality of claims and Adequacy of Representation.  Maryland Rule 2-231(a)(3)-(4)**.  Plaintiffs are adequate representatives of the classes and their interests do not conflict, but are identical with the interests of the members of the classes they seek to represent.  The claims being asserted by the Plaintiffs are typical of those of the Class.  They have retained counsel competent and experienced in the prosecution of complex civil actions in the areas of tobacco and asbestos litigation, and they intend to prosecute this action vigorously for the benefit of the Class.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

50.    **Superiority.  Maryland Rule 2-231(b)(3).**  A class action is superior to other available methods for the fair and efficient adjudication of this litigation.   Individual litigation is both impracticable and unnecessary under the model proposed herein.   Class Members are all identically united in the risk of injury to which they are exposed within each class.  No individual issues of injury exist, let alone predominate in this case,  because membership in each class is

premised only upon purchase or lease of a WHHP without a headset.  In all respects, individual litigation would identically mirror the class action litigation.  Individual litigation would be unduly burdensome to the courts and to the claimants.  Individual litigation further presents a potential for inconsistent or contradictory judgments and would increase delay and expense to all parties in the court system in resolving the complex issue of the case.  This delay and expense would be particularly inefficient in this case, where the risk of injury to which claimants within each class are exposed is identical.  The class action device proposed herein provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single court of thousands of claims which are identical in all respects.  In every respect, class action is the best method for the fair and efficient adjudication of this litigation.  Notice of the pendency and of any resolution of this class action can be provided to members of each class by publication and use of the broadcast media.

## V.  FACTS COMMON TO ALL CLASSES AND COUNTS

51.     Service providers are an integral component of the WHHP industry, without which WHHPs could not be used.

52.     Defendants, Westinghouse, Sprint, Nextel, AT&T, Cellco, Cingular Wireless, Cingular, SBC, Cellular One Group and VoiceStream ("Cell Phone Carriers") are providers of cellular telephone service, and/or control or wholly own subsidiaries which are providers of cellular telephone service.

53.     Defendant Cell Phone Carriers are granted licenses by the FCC to broadcast wireless signals on specific frequency bands to provide cellular telephone service to consumers.

54.     Each manufacturer constructs WHHPs to fit the different specifications of the Cell Phone Carriers.

55.     Each Cell Phone Carrier provides manufacturers and/or sellers of WHHPs with specifications based on its specific frequency band.  The specifications of the battery and circuitry for all WHHPs in a Cell Phone Carrier's network are determined by the Cell Phone Carrier's license and frequency information granted by the FCC.

56.     Each time a WHHP user makes or receives a call a wireless signal is transmitted from the WHHP antenna to the nearest cell tower or from the nearest cell tower to the WHHP antenna, thereby exposing the WHHP user to RFR.

57.     Land lines also play a central role in the operation and use of WHHPs.  Based upon the license granted by the FCC and the frequency specifications provided to sellers and/or manufacturers of WHHPs, the Defendant Cell Phone Carriers create a network by which the wireless signal is transferred to land lines and the call is sent to a receiver or sent to the cell phone customer.

58.     While placing and receiving calls, each named Plaintiff of the Class held their WHHP in the manner for which WHHPs were designed and intended to be used so that the receiver was resting against their ear ("Customary Position"), the manner in which others similarly situated in each class customarily use their WHHPs.

59.     Each time a named Plaintiff of the Class used their WHHP in the Customary Position, the antenna was located next to their head.

60.     Each time a named Plaintiff of the Class used their WHHP, they were exposed to RFR which emanated from the antenna, thereby subjecting them to RFR and, in the absence of a headset, to RFR's biological injuries and/or biological effects and the risk to human health arising therefrom.

61.     The health risk created by the Class Plaintiffs' use of their WHHPs is identical to the

risk to which all other members of the Class were exposed.

62.     Scientific and medical research, published in peer reviewed literature, has demonstrated biological injury and/or biological effects from exposure to RFR within the radio frequency band of 300 megahertz to 2.4 gigahertz.

63.     Appropriately designed headsets when properly used eliminate and/or reduce RFR exposure to the WHHP users' head. WHHPs designed and manufactured for use with a headset have been commercially available at all relevant times. Headsets to be used in conjunction with a WHHP have been commercially available at all relevant times.

64.     In the past, Defendants have marketed headsets as an optional and available accessory at an additional cost. From time to time Defendants have provided headsets at no additional cost with the purchase of a WHHP. Other Defendants have provided headsets to past purchasers at no cost or at a discount for a limited period of time.

65.     At all relevant times Defendants knew or should have known that Class Plaintiffs are exposed to RFR while using a WHHP and as a result are at increased risk for biological injury and/or biological effects.

66.     At all relevant times Defendants knew or should have known that the increased risk of biological injury decreases the farther away the WHHP is located from the user during use of the WHHP.

67.     At all relevant times Defendants knew or should have known that properly designed headsets when used with a WHHP greatly reduce the risk of biological injury to the head. Knowing of the great reduction in risk Defendants have designed and marketed inexpensive headsets that dramatically reduce exposure to RFR thus reducing the risk of biological injury to the user.

68.    At all relevant times Defendants have promoted headsets as a mere convenience to the user without including in the instructions for use that headsets should be used because they can greatly reduce the risk of biological injury to the user's head.

69.    Defendants were aware or should have been aware of numerous studies and experiments that demonstrated the biological injury, health risks and biological effects of RFR dating back to the late 1920s.

70.    As research and studies evolved over the ensuing decades, it was found, among other things, that animal research demonstrated physical injury and/or adverse biological injury and/or biological effects as a result of exposure to varying levels of RFR.

71.    That during this same period of time research was also forthcoming as to the risk to human health posed by exposure to RFR.

72.    By the early 1960's it was well established in the scientific and medical communities that RFR is efficiently absorbed into human tissue and is capable of producing biological injury.

73.    It was equally well known in the scientific and medical community by that time that an antenna is the most efficient means of depositing RFR into the human body and penetrating human tissue and that the temporal lobe of the brain was the most sensitive area of the body to this type of radiation.

74.    Medical and scientific inquiry and research into the harmful biological injury and/or biological effects of RFR continued unabated from the 1960's to the present day.  Throughout this period dozens of peer reviewed research papers were published which, individually and collectively, raised serious and credible questions regarding whether the RFR to which WHHP users were and are exposed posed a threat to their health.

28

75.     The Defendants knew or, by the application of reasonable, developed human skill and foresight, should have known of the dangerous characteristics of WHHPs because such knowledge was, at all times relevant to the claims herein, part of the "state of the art" body of knowledge in the relevant scientific and medical communities.

76.     At all times relevant to the claims herein, the Defendants failed to conduct adequate testing and research regarding the dangerous characteristics of WHHPs.  Not only did the Defendants fail to engage in pre-market testing of WHHPs, but after introducing WHHPs into the marketplace, the Defendants continued to fail to fulfill their ongoing obligation to conduct adequate testing and research regarding the dangerous characteristics of WHHPs.

77.     Throughout this entire period the Defendants, acting individually, collectively and through their respective trade associations, took steps to suppress, discredit and/or minimize this emerging science.

78.     Throughout this same period the Defendants, acting individually, collectively and through their respective trade associations, took steps to ensure that they would be free to manufacture and mass market WHHPs to the consuming public, free from the constraints of any reasonable and necessary safety standards regulating RFR exposure.  They accomplished this by obtaining and exercising dominance and control over the American National Standards Institute ("ANSI") Committee responsible for developing safety standards for RFR emitting devices.

79.     Defendants, individually and through their trade associations, undertook with great public fanfare to fund scientific inquiry into the potential health hazards posed by the use of WHHPs. When this industry-funded research failed to corroborate the industry's reckless and premature claims of safety, and, in fact, presented new evidence of potential health concerns, the industry

responded by terminating the research funding and publicly disparaging, suppressing and minimizing the results.

80.     Despite their knowledge of the literature, research and the industry's own studies, the Defendants continued wrongfully to maintain that WHHPs posed no threat to human health despite mounting abundant evidence to the contrary.

81.     At all relevant times, the biological injury caused by low level RFR of WHHPs which, in turn, gives rise to a  risk to the users' health, was fully known and appreciated by the Defendants.  At all relevant times, the Defendants should have and easily could have minimized, reduced and or eliminated this health risk by acknowledging its existence and providing to each purchaser of WHHPs a headset with appropriate instructions for use.  The Defendants negligently and recklessly failed and/or refused to take this simple step to reduce the health risks to consumers for fear that such action would inhibit their ability to mass market WHHPs to the consuming public, including the Plaintiffs and others similarly situated.

82.     On January 26, 1993, Defendant Motorola announced to the news media, which subsequently reported to the public, that "thousands of studies" had already shown cellular phones were safe.  This statement was fraudulent, deceitful, and misleading.

83.     On July 16, 1993, in furtherance of its dishonest campaign to assure the consuming public of the "safety" of WHHPs, the Cellular Telecommunications Industry Association (CTIA), representing many of the named Defendants, held a press conference and issued a report entitled "Safety Update-Fast Facts: Portable Cell Phone Safety," which, in bold print, deceptively stated, the following: "Rest assured. Cellular telephones are safe!"  The report further stated that cell phones fall within the safety standards of the Federal Communications Commission (FCC).  However, the

30

Defendants fraudulently and deceitfully omitted the fact that the FCC had declared that it does *not* consider itself the "expert agency" for evaluating health effects.

84.     This industry deception prompted Elizabeth Jacobson, Deputy Director for Science at the Center for Devices and Radiological Health, Food and Drug Administration, on July 19, 1993 to send a letter to CTIA then president Thomas Wheeler, which clearly questioned and challenged the misleading statements made by the Defendants to the public regarding the "safety" of WHHPs. In pertinent part, that letter stated:

> "I am writing to let you know that we were concerned about two important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.
>
> First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe. In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all. (Some readers might also wonder how impartial the research can be when its stated goal is "a determination to reassure consumers," and when the research sponsors predict in advance that 'we expect the new research to reach the same conclusion, that the cellular phones are safe."). . . .
>
> We are even more concerned that your press statements did not accurately characterize the relationship between CTIA and the FDA. . . . [S]ince it is not yet clear whether we will help to direct the research program, it is premature to state that we will credential the research.
>
> To sum up, Mr. Wheeler, our role as a public health agency is to protect health and safety, not to "reassure consumers." I think it is very important that the public understand where we stand in evaluating the possibility that cellular phones might pose a health risk. . . .

85.     In or about late 1993, or early 1994, the cell phone industry, including the named

Defendants, through CTIA, organized a committee to prepare a manual for public consumption discussing "responsible" WHHP use.  After receiving a draft of the manual, Thomas Wheeler, then president of CTIA, sent a memorandum to the drafting committee expressing his concerns over certain language in the draft which acknowledged and/or implied that the use of WHHPs could pose health risks.  Mr. Wheeler's memorandum suggested significant substantive deletions from the draft which are set forth.  The committee deleted the offending material set forth here in bold typeface:

> Do not operate your transportable cellular telephone when holding the antenna, or when any person is within 4 inches (10 centimeters) of the antenna.  **Otherwise you may impair call quality, may cause your phone to operate at a higher power level than is necessary, and may expose that person to RF energy in excess of the levels established by the updated ANSI Standard.**
>
> **If you want to limit RF exposure even further, you may choose to control the duration of your calls or maintain a distances from the antenna of more than 4 inches (10 centimeters).**
>
> For best call quality, keep the antenna free from obstructions and point it straight up."

86.    At some point subsequent to, and as a direct consequence of the filing of other proceedings raising concerns about biological injury from RFR, the Defendants (or some of them) began to provide to purchasers (or lessees) of WHHPs a copy of the U.S. Food and Drug Administration's ("FDA") "Update on Mobile Phones" (dated 10/2000).  This document was inserted by the Defendants into the marketing package for newly purchased WHHPs.

87.    The FDA's "Update on Mobile Phones" instructs the consuming public to the following effect:

> **The U.S. Food and Drug Administration's Center for Devices and Radiological Health Consumer Update on Mobile Phones.**
>
> **...Why the concern?**

32

Mobile phones emit low levels of radio frequency energy (i.e., radio frequency radiation) in the microwave range while being used. They also emit very low levels of radio frequency energy (RF), considered non-significant, when in the stand-by mode. It is well known that high levels of RF can produce biological damage through heating effects (this is how your microwave oven is able to cook food). However, *it is not known whether, to what extent, or through what mechanism, lower levels of RF might cause adverse health effects as well. Although some research has been done to address these questions, no clear picture of the biological effects of this type of radiation has emerged to date. Thus, the available science does not allow us to conclude that mobile phones are absolutely safe, or that they are unsafe.* (Emphasis added)....

**How much evidence is there that hand-held mobile phones might be harmful?**

Briefly, there is not enough evidence to know for sure, either way: however, research efforts are on-going. The existing scientific evidence is conflicting and many of the studies that have been done to date have suffered from flaws in their research methods.

**...What is FDA's role concerning the safety of mobile phones?**

Under the law, FDA does not review the safety of radiation emitting consumer products such as mobile phones before marketing, as it does with new drugs or medical devices...

Although the existing scientific data do not justify FDA regulatory actions at this time, FDA has urged the mobile phone industry to take a number of steps to assure public safety. The agency has recommended that the industry:

> · support needed research into possible biological effects of RF of the type emitted by mobile phones;
> · design mobile phones in a way that minimizes any RF exposure to the user that is not necessary for device function; and
> · cooperate in providing mobile phone users with the best possible information on what is known about possible effects of mobile phone use on human health.

88.   More recently, a government agency familiar with the issues surrounding RFR and

the current FCC guidelines acknowledged publically that "Federal health and safety guidelines have not yet developed policies concerning possible risk from long-term, nonthermal exposures."

89.     The agency also stated that "[t]he FCC's exposure guideline is considered protective of effects arising from a thermal mechanism but not from all possible mechanisms.  Therefore, the generalization by many that the guidelines protect human beings from harm by any or all mechanisms is not justified."

90.     The agency also confirmed that "[m]ost people's greatest exposures result from the use of personal communications devices that expose the head.  In summary, the current exposure guidelines used by the FCC are based on the effects resulting from whole-body heating, not exposure of and effect on critical organs including the brain and eyes."

91.     Plaintiffs and others similarly situated were and continue to be misinformed, misled and deceived by the Defendants into believing that WHHPs are safe and pose no threat to human health.

92.     Defendants at all relevant times have controlled the design, assembly, platform for usage, manufacture, marketing, sales and provision of service of WHHPs which have been widely advertised by the Defendants as posing no threat to human health.

93.     The product warnings in effect during the period relevant to this Second Amended Complaint were both substantively and graphically wholly inadequate to alert Plaintiffs and those similarly situated as to the risks associated with WHHP use.

94.     Defendants have never adequately informed the public about the risk of biological injury, which poses a health risk to WHHP users or of the fact that the risk of injury can differ with the amount of use and the sensitivity of the user.

34

## THE CELLULAR TELEPHONE INDUSTRY TRADE ASSOCIATIONS

95.     There are several industry trade groups and/or organizations including Defendants CTIA and TIA , as well as, the CDMA Development Group, and the Mobile Manufacturers Forum of which many of the Defendants are members.

96.     CTIA is in constant contact with all branches of government regarding policy issues, as well as the FCC.  CTIA has specific committees to deal with safety and regulations.  CTIA states on their website: "CTIA also coordinates the industry's efforts to be responsible and responsive to concerns about wireless health and product usage issues, while operating an equipment testing and certification program to ensure high quality and reliability for consumers."

97.     On the Mobile Manufacturers Forum ("MMF") website it states: "The MMF was formed in 1998 to facilitate joint funding of key research projects and cooperation on standards, regulatory issues and communications concerning health and mobile phones."  According to their website MMF's members include Alcatel, Ericsson, Mitsubishi Electric, Motorola, Nokia, Panasonic, Philips, Sagem, Siemens, Sony Ericsson and TCL & Alcatel Mobile Phones.

98.     According to its website the CDMA Development Group ("CDG") was founded in December 1993.  It further states: "The CDG is comprised of CDMA service providers and manufacturers, application developers and content providers."  It also states that its members work together to: "Establish strategic relationships with government ministries, regulatory bodies, and worldwide standards and industry organizations to promote cooperation and consensus on issues facing the CDMA community."

99.     It is through these various trade organizations that the industry works together to undermine the legitimate independent scientific research that is conducted regarding the biological

effects of RFR.  As members of one or more of these trade groups Defendants pool resources for their common goal to prolong definitive answers to many of the outstanding questions facing the scientific and medical communities not to mention governmental bodies regarding the effects of RFR.

100.    Beginning in 1992, to the present, CTIA and TIA represented many of the manufacturer and service provider defendants.  In 1993, CTIA and TIA participated in a Surveillance Program to research, inquire into, and assure the public of the safety of WHHPs.

101.    CTIA and TIA were integral participants in the formation of the Surveillance Program which was formed to study the safety of WHHPs and report its findings to the public and to governmental bodies.

102.    CTIA, with input and assistance from TIA, hired George Carlo ("Carlo") an epidemiologist to chair the Surveillance Program.  Thomas Wheeler, president of CTIA at the time, handpicked Carlo to lead the Surveillance Program, and on January 29, 1993 announced that "it is time for truth and good science to replace emotional videotape and unsupported allegations. Therefore, the cellular communications industry is today announcing that it will fund research to re-validate the findings of the existing studies, which have found that the radio waves from cellular phones are safe."

103.    With the knowledge and approval of CTIA and TIA, Carlo formed Wireless Technology Research ("WTR") the entity which was responsible for the Surveillance Program. CTIA, TIA, and Carlo, through WTR, appointed two Committees to oversee research, the Scientific Advisory Group (SAG) and the Peer Review Board (PRB).

104.    CTIA and TIA, concealed evidence and research of the SAG and PRB which

36

demonstrated that (1) WHHPs were hazardous to the health of consumers, and (2) that more research was necessary to assure the public that WHHPs were safe for use.

105.    CTIA and TIA, intimidated researchers and consultants hired by Carlo and WTR and the SAG.  CTIA and TIA cut and reduced funding of WTR to prevent the research necessary to assure the public that WHHPs were safe for use.

106.    On June 26, 1993, a Motorola executive stated, with the acknowledgment and support of CTIA and TIA, that "thousands of studies" had already shown cellular phones were safe. In the fall of 1993, the cell phone industry appointed a committee to write and develop a consumers manual.  The draft manual included wording which indicated and warned consumers that (1) radio frequency emissions may exceed ANSI safety standards; (2) limit the duration of phone calls; and (3) maintain a distance of four inches from the antenna. The CTIA and the TIA, intentionally and/or negligently changed the wording of the warning/label to omit the warnings and wording listed in this paragraph.

107.    CTIA and TIA were aware or should have been aware in the fall of 1994 that Henry Lai and N.P. Singh, notable and respected scientists at the University of Washington in Seattle, WA had conducted research that demonstrated single and double strand DNA breaks from RFR exposure.

108.    It has been reported that in response to Dr. Lai's study CTIA prepared a media strategy where they would publicly denounce Dr. Lai's findings.  A researcher was hired who said that they could not reproduce Lai's results.  An internal CTIA memo proclaimed victory and stated the industry has successfully "war gamed" the Lai study.  http://www.waveguide.org/news/concofsilence.html.

109.    In March 1994, CTIA and TIA were aware or should have been aware that Dr. Leif

Salford, a respected researcher and physician from Stockholm, Sweden, performed research which found a significant leakage, or breakdown in the blood brain barrier in rats exposed to RFR at 915 megahertz at specific absorption rates within the range of WHHPs.

110.    CTIA and TIA (1) failed to warn the public of Dr. Salford's findings; (2) failed to fund further research of blood brain barrier effects; and (3) failed to attempt to replicate Dr. Salford's research.

111.    CTIA and TIA were aware or should have been aware of research conducted by Motorola at the Veterans Administration in Loma Linda, California by Dr. Ross Adey. The research showed that biological effects were being induced by exposing rats, headfirst, to radio waves generated by a digital WHHP. CTIA and TIA (1) failed to warn the public of the findings; (2) failed to fund further research at Loma Linda by Dr. Adey; and (3) failed to attempt to replicate such research.

112.    In May 1997, Dr. Michael Repacholi from the Royal Adelaide Hospital in South Australia published the findings of their work in Radiation Research, an authoritative scientific journal, that showed a higher incidence of lymphoma in mice exposed to radiation than in mice that were not exposed.  CTIA and TIA (1) failed to warn the public of the findings; (2) failed to fund further research by Dr. Repacholi; and (3) failed to attempt to replicate such research.

113.    CTIA and TIA were aware or should have been aware of several significant epidemiological studies, namely the (1) 1994 Canadian study of electric utility workers who had a statistically significant increase in lung cancer who had jobs in close proximity to mobile communications equipment; (2) a 1996 Air Force personnel studies of more than 800,000 workers exposed to radio frequency radiation that showed a statistical significance in brain tumors; and (3)

a Polish military study of workers exposed to radio waves that showed a statistically significant increase in brain and blood cancers. CTIA and TIA (1) failed to warn the public of such findings; (2) failed to fund further research to validate their work; and (3) failed to replicate such research.

114.    In December, 1998, CTIA and TIA were aware or should have been aware of the research conducted by Doctors Ray Tice and Graham Hook of the Integrated Laboratory Systems in Research Triangle Park, North Carolina. The project was coordinated under a contract with WTR. The research exposed human blood cells to RFR in the WHHP frequency band and showed a 300 percent increase in the incidence of genetic damage through the formulation of micro nuclei. CTIA and TIA (1) failed to warn the public of such findings; (2) failed to fund further research by Tice and Hook to validate their work; and (3) failed to replicate such research.

## BIOLOGICAL EFFECTS AND/OR INJURIES

115.    The industry including Defendants have been deficient in their efforts to inform and protect the public. The industry including Defendants have merely done all that is technically necessary to comply with the current guidelines even though WHHPs have not yet been determined safe. All WHHPs do not emit the same specific absorption rate ("SAR") level.

116.    By making the SAR data difficult to locate and understand, manufacturers obscure vital information that consumers should be able to easily access. Consumers do not realize that they are receiving unwanted harmful RFR every time they use their WHHP.

117.    Additionally, by insisting that WHHPs are safe, even though they neglect to explain to the consumer what "safe" means, Defendants are sending a mixed message.

118.    Until all of the evidence has been gathered the possibility of biological effects and/or injury and long term health effects should be acknowledged and disclosed to consumers and not

ignored by Defendants.

119.    Many published studies describe many WHHP user's common complaints such as headaches, heating behind the ear, and sleep problems, none of which were disclosed to members of the classes or the public by Defendants.

120.    The published studies describe such effects as, disturbances in normal sleeping EEG patterns, unpleasant sensations, including a burning feeling or a dull ache mostly occurring in the temporal, occipital or auricular areas, fatigue, headache, warmth behind or on ear, and a burning skin sensation.

121.    A study found that the risk of experiencing fatigue, headache, warmth behind or on ear, and a burning skin sensation was increased in as little as fifteen (15) minutes of WHHP use. Another study, reported in the Lancet, states that exposure to RFR for thirty-five minutes causes an increase in resting blood pressure.

122.    Another study reported that exposure to WHHP radiation produced faster reaction time in human subjects, thus showing that WHHP radiation does induce biological changes in the brain.

123.    Other published studies describe biological changes in experiments using animals when exposed to microwave radiation. Some of the effects reported include; changes in the blood-brain barrier, calcium efflux in brain cells, changes in the electrically evoked potentials and in long-term potentiation of hippocampal brain sections, and production of high levels of "heat shock proteins."

124.    Several studies have been conducted over the last several years that have lead to published papers in scientific journals which describe increased risks for various tumor types and/or

cancer. In the fall of 2004, Michael Kundi of the Institute of Environmental Health medical faculty at the University of Vienna, reported in the Journal of Toxicology and Environmental Health that a review of nine studies of cell phone users found an increased risk of cancer.

125.    Another study reported an increased risk for developing an acoustic neurinoma for those using an analog WHHP for greater than five years. The study also found an increased risk for developing brain cancer for those who have used an analog WHHP. In another study the authors discuss data showing an increased risk of brain tumors associated with the use of WHHPs. The study also reported increased mortality for analog WHHP users.

126.    Other studies have reported an increased risk for melanoma in the eye associated with the use of WHHPs and an increased risk for Neuroepitheliomatous tumors.

127.    Recent epidemiological studies have found increased risk for brain cancer associated with the use of analog WHHPs. One of these studies found that brain cancer was twice as likely in individuals who used an analog WHHP and the other study found the risk of brain cancer increased by two and a half times when using an analog WHHP.

128.    Many of the more recent studies were not considered by scientific regulating bodies in arriving at their current positions regarding whether or not WHHPs are safe.

**FACTS REGARDING INCREASED CAUTION FOR CHILDREN'S USE OF WHHPS**

129.    Today, the fastest growing group of WHHP users are children and young people. This growth is actively encouraged by advertising campaigns from the WHHP industry, extolling how indispensable the phones are to their active life styles.

130.    The still developing nervous system and associated brain-wave activity in a child are more vulnerable to aggression by the pulses of microwaves used in  GSM WHHPs than a mature

adult. The current SAR standard for RFR exposure from WHHPs is based on exposure testing of a model of an adult male head. No consideration is given to the smaller heads of both females and children.

131.    Additionally, the increased mitotic activity in the cells of developing children makes them more susceptible to genetic damage from RFR.

132.    A child's immune system's efficiency is reduced by WHHP radiation. Children's immune systems are generally less strong than that of an adult. Children will be less able to fend off any adverse health effect provoked by (chronic) exposure to WHHP radiation.

133.    The World Health Organization ("WHO") Expert Group recommends those children less than sixteen years of age be discouraged from using mobile phones. Their recommendation is based on the fact that children:

a.      Have developing nervous systems that are likely to be more vulnerable to potentially hazardous agents than mature nervous systems;

b.      Children have smaller heads, thinner skulls, and higher tissue conductivity which may mean that children can absorb more energy from a given phone than do adults; and

c.      If detrimental effects are found to be caused by mobile phones, those using phones for a longer period of their lives will tend to accumulate greater risk.

134.    Researchers with the WHO stated in an article in the journal of Pediatrics (August 2005) that until more is known, pediatricians "could advise parents that their children's

42

exposure can be reduced by restricting the length of calls or by using hands-free devices to keep the phones away from the head and body."

135.    The British Government through an independent expert group called the Stewart Inquiry, the German Academy of Pediatrics, the "Bundesamt füür Strahlenschutz", which is the federal authority for radiation protection in Germany, Sianette Kwee, Professor, Department of Medical Biochemistry, University of Aarhus, the Denmark Member of the Editorial Board of *Bioelectrochemistry* who is the Danish expert representative in the European Union's COST 281 project "Potential health effects from Emerging Wireless Communication systems", Thailand's interior minister, Dr. Gro Harlem Brundtland, the Director General of the World Health Organization (WHO), and the French Government have all cautioned that children are at increased risk for experiencing adverse health effect from the use of WHHPs.

136.    Sir William Stewart, of the National Radiological Protection Board in a statement made on January 11, 2005, urged parents not to give cell phones to children under eight, and said that those between eight and 14 should use them only when absolutely necessary. He stated further that there was enough uncertainty about mobile phones to adopt the precautionary approach, particularly when it comes to children. Professor Stewart admitted that new research being carried out across Europe meant he was now "more concerned" about health risks than five years ago. Stewart also called for clearer information regarding how much radiation is absorbed in the body from different mobile phones.

137.    Governmental, consumer and physician groups in England, Italy, Russia, Germany and France have all advised a precautionary approach. The governments of Thailand and Bangladesh have also expressed concern regarding the use of mobile phones by children. On

43

December 8, 2000 the German Academy of Pediatrics advised parents to restrict their children's use of mobile phones.  On July 31, 2001, the head of the Bundesamt fur Strahlenschutz, Wolfram Koenig, the federal authority for radiation protection in Germany stated that "Parents should take their children away from that technology [mobile phones]".  On June 20, 2005 the French Agency for Environmental Health Safety recommended that children use mobile phones only under certain conditions and that they use a hands-free set until more is known about possible health risks.

138.    It has been reported that Nicolas Johnson, former Federal Communications Commission member signed a petition and sent a letter to the members of Congress in 2005 asking them to investigate the marketing of cell phones to children. The International Commission for Non-Ionizing Radiation Protection stated that children's use of cell phones may be of special concern.

139.    It has been reported that on April 27, 2000, Norbert Hankin, an environmental scientist at the EPA's Office of Radiation and Indoor Air, wrote in a letter that "[r]ecent studies involving short-term exposures have demonstrated that the subtle effects on brain functions can be produced by low-intensity pulse modulated radio-frequency (RF) radiation.  Some research involving rodents has shown adverse effects on short-term and long-term memory.  The concern is that if such effects may occur in young children, then even slight impairment of learning ability over years of education may negatively affect the quality of life that could be achieved by these individuals, when adults.  The potential effect on learning of exposure from telecommunication devices used by children should be considered for study by the Radiation Protection Project."

140.    A recent study determined that a WHHP call for just two minutes can continue to effect the electrical activity in a child's brain for up to an hour after use.  The same study showed that a child's use of a WHHP results in radiation penetrating deep into a child's brain.  Disturbed brain

44

activity can lead to psychiatric or behavioral problems and may also cause learning difficulties in children.

141.    Another published study showed that WHHPs could cause memory loss and epilepsy in young users.  In the study it was found that nonthermal radiation from the WHHPs changed the structure of human cells and that children were particularly vulnerable because their skulls were smaller and thinner, making it easier for radiation to penetrate.

**FACTS RELATING TO DRIVING SAFETY**

142.    In addition to the biological effects and risks to health detailed above, using a WHHP without a headset or other "hands free" device also increases the risk of accidents and injury while operating a motor vehicle. The neighboring District of Columbia  bans the use of WHHPs while operating motor vehicles as do the states of New Jersey and New York.  Since many Class members travel to these states, the marketing, distribution and sale of WHHPs without a headset or other appropriate "hands free" device facilitates the violation of these laws.

**VI.  CLAIMS FOR RELIEF**

**COUNT 1**

**VIOLATIONS OF MARYLAND CONSUMER PROTECTION ACT**

143.    The Plaintiffs on behalf of themselves, and others similarly situated, hereby incorporate by reference, as if fully set forth herein, all of the aforegoing paragraphs of the Second Amended Complaint, and further allege as follows.

144.    Section 13-408 of the Maryland Consumer Protection Act, Md. Com. Law Code Ann. § 13-101 et seq., authorizes Plaintiffs, and others similarly situated, to bring an action to recover for loss sustained as a result of a practice prohibited by the Act.

145.    By engaging in the conduct described above, the Defendants have violated §

45

13-301(1), (2), (3) and (9) of the Consumer Protection Act by, among other things:

    a.    engaging in unfair and deceptive trade practices as defined in § 13-301(1) by making false and misleading oral and written statements that had, and have, the capacity, tendency or effect of deceiving or misleading Maryland consumers and Plaintiffs and others similarly situated;

    b.    engaging in unfair or deceptive trade practices as defined in § 13-301(2)(i) by making representations that WHHPs have an approval, characteristics, use or benefit which they do not have, including, but not limited to, the Defendants' statements concerning the lack of detrimental health consequences of the use of WHHPs when used without a headset;

    c.    engaging in unfair or deceptive trade practices as defined in § 13-301(3) by failing to state material facts the omission of which deceived or tends to deceive, including, but not limited to, facts relating to the lack of detrimental health consequences of the use of WHHPs when used without a headset; and

    d.    engaging in unfair or deceptive trade practices as defined in § 13-301(9)(i) through their deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that Maryland consumers, including Plaintiffs and others similarly situated, rely upon the same in connection with the

46

purchase and use of WHHPs.

146.    At all relevant times Defendants knew or should have known that Class Plaintiffs are exposed to RFR while using a WHHP and as a result are at increased risk for biological injury.

147.    At all relevant times Defendants knew or should have known that the increased risk of biological injury decreases the farther away the WHHP is located from the user during use of the WHHP.   At all relevant times Defendants knew or should have known that properly designed headsets when used with a WHHP greatly reduce the risk of biological injury.  Knowing of the great reduction in risk Defendants have designed and marketed inexpensive headsets that dramatically reduce exposure to RFR thus reducing the risk of biological injury to the user.

148.    At all relevant times Defendants have promoted headsets as a mere convenience to the user without including in the instructions for use that headsets can greatly reduce the risk of biological injury to the user.

149.    To remedy these violations, it is requested that damages be awarded for the losses sustained by Plaintiffs, and others similarly situated, and reasonable attorneys' fees pursuant to § 13-408 of the Consumer Protection Act.

150.    As a direct and proximate result of the Defendants' violation of Maryland law, Plaintiffs and others similarly situated were exposed to biological injury resulting in a health risk. WHEREFORE, Plaintiffs pray for the following relief:

a.      For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiffs J. Douglas Pinney, Michael J. Haley and for each Class Member;

b.      Reimbursing Plaintiff Gino Cammarata and for each Class Member purchaser or

lessee of a WHHP the cost incurred in purchasing or acquiring a headset;

c.    Providing each Class member who has not been so provided, a WHHP that can be used with a headset;

d.    Providing each Class member with instructions for the use of a headset, as well as reasons why a headset should be used;

e.    For punitive damages to Plaintiffs and other members of the Class;

f.     For costs, attorney fees, and legal pre-judgment interest; and

g.    An Order certifying the Class and appointing the Plaintiffs and their counsel to represent the Class.

## COUNT II

## BREACH OF IMPLIED WARRANTIES

151.    The Plaintiffs on behalf of themselves, and others similarly situated, hereby incorporate by reference, as if fully set forth herein, all of the aforegoing paragraphs of the Second Amended Complaint, and further allege as follows.

152.    Defendants are engaged in the business of design, manufacture, testing, assembly, sale, and provision of services for WHHPs.

153.    Under Maryland common and statutory law, a warranty of merchantability is implied in all sales transactions.  A warranty of merchantability is a warranty implied by law that a product is fit for the ordinary use for which it is used, is properly labeled and conforms to the representations made about it.  See Md. Code Ann., Com. Law. §§ 2-314 (2001).

154.    At the time Defendants marketed, sold and distributed WHHPs for use by Class Plaintiffs and others similarly situated, Defendants knew of the use for which WHHPs were intended

and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

155.   The other Defendants, in like manner, impliedly so warranted WHHPs to members of the Class who purchased or leased WHHPs from these other manufacturers and/or sellers.

156.   The Warranty delivered with the LG WHHP Plaintiff Cammarata purchased, promised in pertinent part, LG warrants this product to be free of defects in material and workmanship at the time of its original purchase and for the subsequent period of one (1) year. If, during the period of Warranty, this product proves defective under normal and customary use it will be repaired or replaced.

157.   The Warranty delivered with the Motorola RAZR V3c WHHP Plaintiff Haley purchased, promised in pertinent part:

> What Does this Warranty Cover? Subject to the exclusions contained below, Motorola, Inc. warrants its telephones, pagers, messaging devices, and consumer and professional two-way radios (excluding commercial, government or industrial radios) that operate via Family Radio Service or General Mobile Radio Service, Motorola-branded or certified accessories sold for use with these Products ("Accessories") and Motorola software contained on CD-ROMs or other tangible media and sold for use with these Products ("Software") to be free from defects in materials and workmanship under normal consumer usage for the period(s) outlined below. This limited warranty is a consumer's exclusive remedy, and applies as follows to new Motorola Products, Accessories and Software purchased by consumers in the United States or Canada, which are accompanied by this written warranty: . . . Products and Accessories as defined above, unless otherwise provided for below. One (1) year from the date of purchase of the product unless otherwise provided for below.

158.   The manual delivered with Plaintiff Cammarata's WHHP set forth an express warranty regarding safety titled "Safety Information". The Safety Information provided for the WHHP is substantially similar for all of the WHHPs sold by the Defendants herein to each of the

members of the Class.  The promises and affirmations of fact state, in virtually identical language

for all of the manufacturers and sellers, as follows:

> **"Exposure to Radio Frequency Signals**
>
> Your wireless handheld portable telephone and receiver is a low power radio transmitter and receiver.  When it is ON, it receives and also sends out radio frequency (RF) signals.
>
> In August, 1996, the Federal Communications Commission (FCC) adopted RF exposure guidelines with safety levels for handheld wireless phones.  Those guidelines are consistent with the safety standards previously set by both U.S. and international standards previously set by both U.S. and international standard bodies:
>
> · ANSI C95.1 (1992)
> · NCRP Report 86 (1986)*
> · ICNIRP (1996)
>
> Those standards were based on comprehensive and periodic evaluations of the relevant scientific literature.  For example, over 120 scientists, engineers, and physicians from universities, government health agencies, and industry reviewed the available body of research to develop the ANSI Standard (C95.1).
>
> The design of your phones complies with the FCC guidelines (and those standards)."

159.    Given the foregoing express promises of safety and warranties against defects in

materials and workmanship, the purported disclaimer of such warranties by defendants in their

warranty manuals and service agreement are ineffective pursuant to MD Code ANN., Com. Law I

§2-316, §2-719, §2-302, (Repl. Vol. 1997).

160.  Thus, the statements by defendants in their manuals and service agreements that "THIS

LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED

50

EITHER IN FACT OR BY OPERATIONS OF LAW, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MARKETABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE," and "NO OTHER EXPRESS WARRANTY IS APPLICABLE TO THIS PRODUCT. THE DURATION OF ANY IMPLIED WARRANTIES, INCLUDING THE IMPLIED WARRANTY OF MARKETABILITY OR MERCHANTABILITY, IS LIMITED TO THE DURATION OF THE EXPRESS WARRANTY HEREIN," were and are contrary to the aforementioned Maryland law. The promises and affirmations of fact delivered by each of the Defendants with respect to "Safety Information" of the phones are express warranties that may not be contradicted by inconsistent warranty disclaimers without being rendered unfair, deceptive and unconscionable. To the extent such disclaimers attempt to disclaim any promise of safety, they are, therefore, unfair and deceptive. To the extent Defendants cannot prove that the WHHPs are safe for ordinary consumer use, the WHHPs do not conform to the express warranties and affirmations of fact and, therefore, are not "free of defects in materials and workmanship," as promised. Each of Defendants' manuals and service agreements allocated the burden of proving safe operation and the risk of unsafe operation from radio frequency signals to Defendants, thus requiring Defendants herein to meet their promise of safety.

161.    The manual delivered with Plaintiff Haley's Motorola RAZR V3c WHHP set forth an express warranty regarding safety. The safety information provided for the WHHP is substantially similar for all of the WHHPs sold by the Defendants herein to each of the members of the Class. The promises and affirmations of fact state, in virtually identical language for all of the manufacturers and sellers, as follows:

51

Exposure to Radio Frequency (RF) Energy

Your mobile device contains a transmitter and receiver. When it is ON, it receives and transmits RF energy. When you communicate with your mobile device, the system handling your call controls the power level at which your mobile device transmits. Your Motorola mobile device is designed to comply with local regulatory requirements in your country concerning exposure of human beings to RF energy.

162.    Given the foregoing express promises of safety and warranties against defects in materials and workmanship, the purported disclaimer of such warranties by Defendants in their warranty manuals and service agreement are ineffective pursuant to MD Code ANN., Com. Law §2-316, §2-719, §2-302, (Repl. Vol. 1997).

163.    Thus, the statements by Defendants in their manuals and service agreements that:

What Other Limitations Are There? Any implied warranties, including without limitation the implied warranties of merchantability and fitness for a particular purpose, shall be limited to the duration of this limited warranty, otherwise the repair, replacement, or refund as provided under this express limited warranty is the exclusive remedy of the consumer, and is provided in lieu of all other warranties, express or implied. In no event shall Motorola be liable, whether in contract or tort (including negligence) for damages in excess of the purchase price of the product, accessory or software, or for any indirect, incidental, special or consequential damages of any kind, or loss of revenue or profits, loss of business, loss of information or data, software or applications or other financial loss arising out of or in connection with the ability or inability to use the products, accessories or software to the full extent these damages may be disclaimed by law.

were and are contrary to the aforementioned Maryland law. The promises and affirmations of fact delivered by each of the Defendants with respect to "Safety" of the phones are express warranties that may not be contradicted by inconsistent warranty disclaimers without being rendered unfair, deceptive and unconscionable. To the extent such disclaimers attempt to disclaim any promise of safety, they are, therefore, unfair and deceptive. To the extent

Defendants cannot prove that the WHHPs are safe for ordinary consumer use, the WHHPs do not

conform to the express warranties and affirmations of fact and, therefore, are not "free of defects

in materials and workmanship," as promised.  Each of Defendants' manuals and service

agreements allocated the burden of proving safe operation and the risk of unsafe operation

from radio frequency signals to Defendants, thus requiring Defendants herein to meet their

promise of safety.

164.  Similarly, the purported warranty disclaimer included in Plaintiff Haley's agreement

with Defendant Cellco d/b/a Verizon Wireless of express and implied warranties in their manuals

and service agreement:

> Disclaimer of Warranties.  We make no representations or warranties, express
> or implied, including, to the extent permitted by applicable law, any implied
> warranty of merchantability or fitness for a particular purpose concerning
> your service or your wireless phone.  We can't promise uninterrupted or
> error-free service and don't authorize anyone to make any warranties on our
> behalf.  This doesn't deprive you of any warranty rights you may have against
> anyone else.

are ineffective as to Plaintiff Haley and all others similarly situated pursuant to MD Code ANN.,

Com. Law §2-316, §2-719, §2-302, (Repl. Vol.1997).  Other Defendants' similar disclaimers of

warranties are likewise ineffective.

165.  Class Plaintiffs, and others similarly situated, used and/or operated the WHHPs as

they were intended to be used and in the manner foreseeable by Defendants.

166.  Defendants Motorola, LG, Cellco, AT&T, CEI, and Baltimore Communications

breached said warranty, as did the other Defendants to those similarly situated in that the WHHPs

created a health risk and were unfit for ordinary and intended use as described above in failing to

include a headset which shielded or protected users from RFR.

167.    As a direct and proximate result of the Defendants' breach, Class Plaintiffs and others similarly situated, were subjected to a health risk.

168.    Plaintiffs have notified Defendants of the breach of warranty within a reasonable time after discovering the breach and before filing the Second Amended Complaint.

WHEREFORE, Plaintiffs pray for the following relief:

a.    For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiffs J. Douglas Pinney, Michael J. Haley and for each Class Member;

b.    Reimbursing Plaintiff Gino Cammarata and for each Class Member purchaser or lessee of a WHHP the cost incurred in purchasing or acquiring a headset;

c.    Providing each Class member who has not been so provided, a WHHP that can be used with a headset;

d.    Providing each Class member with instructions for the use of a headset, as well as reasons why a headset should be used;

e.    For punitive damages to Plaintiffs and other members of the Class;

f.    For costs, attorney fees, and legal pre-judgment interest; and

g.    An Order certifying the Class and appointing the Plaintiffs and their counsel to represent the Class.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF

## MERCHANTABILITY(FAILURE TO WARN)

169. The Plaintiffs on behalf of themselves, and others similarly situated, hereby incorporate

by reference, as if fully set forth herein, all of the aforegoing paragraphs of the Second Amended Complaint, and further allege as follows.

170.  Under Maryland common and statutory law, a warranty of merchantability is implied in all sales transactions.  A warranty of merchantability is a warranty implied by law that a product is fit for the ordinary use for which it is used, is properly labeled and conforms to the representations made about it.  See Md. Code Ann., Com. Law. §§ 2-314 (2001).

171.  At the time Defendants marketed, sold and distributed WHHPs for use by Class Plaintiffs and others similarly situated Defendants knew of the use for which WHHPs were intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

172.  The other Defendants, in like manner, impliedly so warranted WHHPs to members of the classes who purchased or leased WHHPs from these other manufacturers and/or sellers.

173.  Class Plaintiffs, and others similarly situated, used and/or operated the WHHPs as they were intended to be used and in the manner foreseeable by Defendants.

174.  Defendants Motorola, Cellco d/b/a Verizon Wireless, AT&T, CEI and Baltimore Communications breached said warranty, as did the other Defendants to those similarly situated in that they failed to warn Plaintiffs and others similarly situated that WHHPs cause biological injury and thus create a health risk making them unfit for their ordinary and intended use as described above when failing to use a headset which prevents RFR from depositing in the user's head and/or brain.

175.  As a direct and proximate result of the Defendants' breach, Class Plaintiffs, and others similarly situated, were subjected to a health risk.

WHEREFORE, Plaintiffs pray for the following relief:

a.   For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiffs J. Douglas Pinney, Michael J. Haley and for each Class Member;

b.   Reimbursing Plaintiff Gino Cammarata and for each Class Member purchaser or lessee of a WHHP the cost incurred in purchasing or acquiring a headset;

c.   Providing each Class member who has not been so provided, a WHHP that can be used with a headset;

d.   Providing each Class member with instructions for the use of a headset, as well as reasons why a headset should be used;

e.   For punitive damages to Plaintiffs and other members of the Class;

f.    For costs, attorney fees, and legal pre-judgment interest; and

g.   An Order certifying the Class and appointing the Plaintiffs and their counsel to represent the Class.

## COUNT IV

## BREACH OF EXPRESS WARRANTIES

176.   Plaintiffs, reallege, as if fully set forth, each and every allegation contained in the foregoing paragraphs, and further allege.

177.   Defendants are engaged in the design, manufacture, testing, assembly, sale, and provision of services for WHHPs.

178.   Defendants' advertisements, promotional statements, and other public statements contained broad claims amounting to a warranty that WHHPs were safe as sold, that they did not require the use of a headset except as a convenience to the consumer, and that there were no

biological effects or associated potential adverse health effects arising from the use of WHHPs without an appropriately designed headset.  See MD Comm. §2-313.

179.    Defendants breached their warranties by offering for sale, and selling as safe, WHHPs that expose the user to RFR which can cause biological injury and may lead to health effects.

180.    The breach of the express warranties by Defendants has caused Plaintiff to be exposed to RFR  and to any biological injury or adverse health effects arising from the use of WHHPs without an appropriately designed headset, thus causing Plaintiff to incur damages.

181.    As a direct and proximate result of the Defendants' breach, Class Plaintiffs and others similarly situated, were subjected to a health risk.

182.    Plaintiffs have notified Defendants of the breach of warranty within a reasonable time of discovering the breach and prior to filing the Second Amended Complaint.

WHEREFORE, Plaintiffs pray for the following relief:

a.    For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiffs J. Douglas Pinney, Michael J. Haley and for each Class Member;

b.    Reimbursing Plaintiff Gino Cammarata and for each Class Member, purchaser or lessee of a WHHP the cost incurred in purchasing or acquiring a headset;

c.    Providing each Class member who has not been so provided, a WHHP that can be used with a headset;

d.    Providing each Class member with instructions for the use of a headset, as well as reasons why a headset should be used;

57

e.      For punitive damages to Plaintiffs and other members of the Class;

f.       For costs, attorney fees, and legal pre-judgment interest; and

g.      An Order certifying the Class and appointing the Plaintiffs and their counsel to

represent the Class.

## COUNT V

## CIVIL CONSPIRACY

183.    The Plaintiffs on behalf of themselves, and others similarly situated, hereby

incorporate by reference, as if fully set forth herein, all of the aforegoing paragraphs of the Second

Amended Complaint, and further allege as follows.

184.    At all times relevant and to the present time, Defendants formed confederacies, trade

associations or affiliations (CTIA, Telecommunications Industry Association ("TIA") and Wireless

Telephone Research ("WTR")) and entered into agreements and/or tacit understandings to jointly,

and in conspiracy with each other, market, in disregard of the obligations they owed the consuming

public, through warranties and otherwise, unreasonably dangerous and defective WHHPs.  They

conducted their marketing by improper and wrongful means, including suppressing information

related to the health risks and biological injury associated with RFR emissions from WHHPs, and

placing into the stream of commerce dangerously defective WHHPs.  In so doing, Defendants

defrauded Plaintiffs, and others similarly situated, and failed to warn Plaintiffs and others similarly

situated, of the biological injury and resulting health risks associated with WHHPs.

185.    Defendants acted collectively in:

58

a.    marketing, producing and promoting the use of WHHPs without proper tests or warnings and without regard to the dangerous RFR emitted therefrom and its effects upon Plaintiffs and others similarly situated;

b.    suppressing, discouraging and/or retarding appropriate research, testing, regulation and public dissemination of information concerning RFR emissions and the effects those emissions would have on the Plaintiffs and others similarly situated; and

c.    ignoring, disparaging, or misleading the public about medical and scientific data available to them which clearly indicated that RFR emissions from WHHPs create biological injury and resulting health risks.

186.   Through the foregoing course of conduct, Defendants conspired to breach the warranties and commit the tortious acts described in this Second Amended Complaint, in furtherance of their agreement or understanding to promote and market WHHPs.

187.   The Defendants knew or, by the application of reasonable, developed human skill and foresight, should have known of the dangerous characteristics of the WHHPs because such knowledge was, at all times relevant to the claims herein, part of the "state of the art" body of knowledge in the relevant scientific and medical communities.

188.   At all times relevant to the claims herein, the Defendants failed to conduct adequate testing and research regarding the dangerous characteristics of WHHPs. Not only did the Defendants fail to engage in pre-market testing of WHHPs, but after introducing WHHPs into the marketplace, the Defendants continued to fail to fulfill their ongoing obligation to conduct adequate testing and research regarding the dangerous characteristics of WHHPs.

189.    Defendants were aware of the biological injury and potential health risks to those exposed to RFR emissions from WHHPs prior to the use of same by Plaintiffs and others similarly situated.

190.    At all relevant times, notwithstanding their knowledge of the health risks of RFR emission from WHHPs, Defendants collectively thwarted efforts to regulate and control RFR emissions of WHHPs.

191.    Notwithstanding their extensive knowledge of the health risks of RFR emissions from WHHPs, Defendants continued to promote WHHPs as appropriate for use and, in so doing, defrauded the Plaintiffs and others similarly situated into believing WHHPs are safe without the use of a headset.

192.    Defendants, acting collectively, to this very day, have failed and continue to fail to properly instruct and warn consumers about the health risks and biological injury associated with RFR emissions from WHHPs, notwithstanding Defendants' knowledge of same.

193.    At all relevant times, notwithstanding their knowledge of the health risks of RFR emissions from WHHPs, Defendants continued, and continue to this very day, to place into the stream of commerce dangerous and defective WHHPs without providing a headset.

194.    Defendants' collective, conspiratorial and tortious activities were knowingly and purposefully designed for their own economic and pecuniary benefit and were performed in furtherance of Defendants' respective and joint business interests.

195.    As a direct and proximate result of Defendants' conduct, Plaintiffs and others similarly situated are being and will be exposed to a health risk due to the failure of Defendants to provide a headset.

60

196.    At all times relevant hereto, the Defendants actually knew of the defective nature of WHHPs, as herein set forth, and continued to design, manufacture, market, sell and/or provide service for WHHPs so as to maximize sales and profits at the expense of public health and safety. Defendants' conduct is such as to establish that their actions were a result of fraud, evil motive, actual malice, and the conscious and deliberate disregard of foreseeable health threats to Plaintiffs and others similarly situated.  Plaintiffs and others similarly situated are entitled to damages, punitive and compensatory.

WHEREFORE, Plaintiffs pray for the following relief:

a.    For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiffs J. Douglas Pinney, Michael J. Haley and for each Class Member;

b.    Reimbursing Plaintiff Gino Cammarata and for each Class Member purchaser or lessee of a WHHP the cost incurred in purchasing or acquiring a headset;

c.    Providing each Class member who has not been so provided, a WHHP that can be used with a headset;

d.    Providing each Class member with instructions for the use of a headset, as well as reasons why a headset should be used;

e.    For punitive damages to Plaintiffs and other members of the Class;

f.    For costs, attorney fees, and legal pre-judgment interest; and

g.    An Order certifying the Class and appointing the Plaintiffs and their counsel to represent the Class.

## COUNT VI

## CIVIL BATTERY

197.    The Plaintiffs on behalf of themselves, and others similarly situated, hereby incorporate by reference, as if fully set forth herein, all of the aforegoing paragraphs of the Second Amended Complaint, and further allege as follows.

198.    The aforementioned conduct and/or omissions by Defendants and/or their respective agents, servants, employees, and/or otherwise related or affiliated entities intentionally inflicted offensive, non-consensual touching to the Plaintiffs, and the general public by exposing them to RFR at levels that cause biological injury and/or biological effects and can not yet be proven safe.

199.    Defendants, directly and/or through their respective agents, servants, employees, and/or otherwise related or affiliated entities, intended to cause and inflict offensive, non-consensual touching to the Plaintiffs and the general public.

200.    As a direct and proximate result of Defendants' aforesaid intentional conduct and/or omissions, Plaintiffs and other similarly situated have sustained repeated exposures.

WHEREFORE, Plaintiffs pray for the following relief:

a.      For compensatory damages including but not limited to amounts necessary to purchase a WHHP headset for Plaintiffs J. Douglas Pinney, Michael J. Haley and for each Class Member;

b.      Reimbursing Plaintiff Gino Cammarata and for each Class Member purchaser or lessee of a WHHP the cost incurred in purchasing or acquiring a headset;

c.      Providing each Class member who has not been so provided, a WHHP that can be used with a headset;

d.    Providing each Class member with instructions for the use of a headset, as well as

      reasons why a headset should be used;

e.    For punitive damages to Plaintiffs and other members of the Class;

f.    For costs, attorney fees, and legal pre-judgment interest; and

g.    An Order certifying the Class and appointing the Plaintiffs and their counsel to

      represent the Class.

## COUNT VII

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for such issues as may be tried by a jury.

Peter G. Angelos
H. Russell Smouse
Glenn E. Mintzer
Law Offices of Peter G. Angelos, P.C.
100 N. Charles Street
One Charles Center, 19th Floor
Baltimore, Maryland 21201
(410) 649-2000
Attorneys for Plaintiffs

Of Counsel:

Sherrilyn Ifill
830 Glen Allen Drive
Baltimore, Maryland 21229
(410) 706-8394

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of January, 2006, copies of the foregoing

Plaintiffs' Second Amended Complaint and Second Amended Complaint (Comparison Copy)

were served on the following counsel by first class, postage pre-paid mail:

John B. Isbister, Esquire
Tydings & Rosenberg, LLP
100 E. Pratt Street, 26th Floor
Baltimore, Maryland 21202

Steven M. Zager, Esquire
Akin Gump Strauss Hauer & Feld, LLP
711 Louisiana Street, 44th Floor
Houston, Texas 77002

James P. Ulwick, Esquire
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202

Charles Babcock, Esquire
David T. Moran, Esquire
Ryan Wirtz, Esquire
Jackson Walker, LLP
901 Main Street, Suite 6000
Dallas, Texas 75202

Paul S. Schleifman, Esquire
Shook, Hardy & Bacon, LLP
600 14th Street, N.W., Ste. 800
Washington, D.C. 20005

J. Stan Sexton, Esquire
Madeline M. McDonough, Esquire
Douglas S. Beck, Esquire
Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, Missouri 64108

Paul F. Strain, Esquire
Venable, Baetjer & Howard, LLP
1800 Mercantile Bank & Trust Building
2 Hopkins Plaza, Suite 1800
Baltimore, Maryland 21201

Jane Fugate Thorpe, Esquire
Scott A. Elder, Esquire
Alston & Bird, LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

Mark H. Kolman, Esquire
Deborah Goldstock Ringel, Esquire
Dickstein Shapiro Morin & Oshinsky, LLP
2101 L Street, N.W.
Washington, D.C. 20037

Edward M. Crane, Esquire
Todd A. Frankel, Esquire
Skadden, Arps, Slate, Meagher & Flom
3333 West Wacker Drive
Suite 2100
Chicago, Illinois 60606-1285

Waller T. Dudley, Esquire
McGuire Woods, LLP
1750 Tysons Boulevard, Ste. 1800
McLean, Virginia 22102

Francis A. Citera, Esquire
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601

Robert B. Green, Esquire
Irwin Green & Dexter, LLP
301 W. Pennsylvania Avenue
Towson, MD 21204

Raymond B. Biagini, Esquire
Lisa M. Norrett, Esquire
McKenna & Cueno, LLP
1900 K Street, N.W.
Washington, DC 20006

Terrance J. Dee, Esquire
Garrett Johnson, Esquire
Michael Slade, Esquire
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Ericka L. Kleiman, Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street
20th Floor
Baltimore, MD 21202

John J. Nagle, III, Esquire
Rebecca A. Fleming, Esquire
Bodie, Nagle, Dolina, Smith & Hobbs, P.A.
21 W. Susquehanna Avenue
Towson, Maryland 21204

Maureen E. Murphy, Esquire
Murphy & Murphy, LLC
14 North Rolling Road
Catonsville, Maryland 21228

Paul E. Freehling, Esquire
Seyfarth Shaw LLP
55 East Monroe Street
Suite 4200
Chicago, IL 60603-5803

Michael E. Yaggy, Esquire
Anthony M. Conti, Esquire
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, MD 21209

Paul D. Krause, Esquire
Laura N. Steel, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
1341 G Street, N.W., 5th Floor
Washington, D.C. 20005

Gregg Bernstein, Esquire
Martin, Snyder & Bernstein P,.A.
217 East Redwood Street
Suite 200
Baltimore, MD 21202

Brian P. Brooks, Esquire
John H. Beisner, Esquire
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006-4001

Thomas C. Watson, Esquire
Curtis S.Renner, Esquire
Watson & Renner
1900 M. Street, NW Suite 850
Washington, DC  20036-3307

Charles L. Perry, Esquire
Andrews Kurth LLP
11717 Main Street, Suite 3700
Dallas, TX 75201

Thomas Kline, Esquire
L. Eden Burgess, Esquire
Andrews Kurth LLP
1701 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006

Donald Segal, Esquire
Segal, McCambridge, Singer and Mahoney, Ltd.
One IBM Plaza, Suite 200
Chicago, IL 60611

Ronald M. Cherry, Esquire
Patrick R. Buckler, Esquire
McQuire Woods, LLP
7 Saint Paul Street, Suite 1000
Baltimore, MD 21202

William F. Gately, Esquire
Howell & Gately
One Charles Center,  19th Floor
100 N. Charles Street
Baltimore, MD 21201

George C. Doub, Esquire
William H. Murphy & Associates, P.A.
12 West Madison Street
Baltimore, MD 21201

James W. Bartlett, III, Esquire
Andrew M. Winick, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
400 East Pratt Street, 7th Floor
Baltimore, MD 21202

H. Michael O'Brien, Esquire
Jason P. Sultzer, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannet Drive
White Plains, NY 10604

Brian A. Coleman, Esquire
Dina M. Gold, Esquire
Drinker Biddle & Reath, LLP
1500 K Street, N.W.
Suite 1100
Washington, D.C.  20005

Seamus C. Duffy, Esquire
Drinker Biddle & Reath, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103


H. Russell Smouse
Attorney for Plaintiffs